## A. J. McCARTY *v.* THE STATE.

1. CONTINUANCE. — In a murder case the accused asked a first continuance for the purpose of obtaining certain witnesses to prove that he was crazy drunk when he committed the homicide. The record shows that the condition of the accused was fully in proof by other witnesses; that the homicide was utterly unprovoked, and the accused was only convicted of murder in the

second degree. *Held*, that the refusal of the continuance could not have been to the prejudice of the accused.

2. Drunkenness. — Temporary insanity resulting from voluntary intoxication is no defense for crime; but, in a trial for murder, it may be proved for the purpose of enabling the jury to determine whether the offense was murder in the first or in the second degree. Drunk or sober, individuals are amenable to the law for their acts.

3. Change of Venue. — It is no longer debatable that the court below, in passing upon an application for a change of venue, grounded on allegations of local prejudice or influential combinations, may examine the supporting affiants, and hear the sworn statements of other citizens touching the grounds of the application. Unless it appears that the court below, in overruling the application, abused its discretion, this court will not interfere.

4. Evidence. — In a trial for murder, the accused asked his own witness, "Did the defendant, by reason of his drunkenness, know you or any one else?" *Held*, that the question assumed the fact of drunkenness, and was leading.

Appeal from the District Court of McLennan. Tried below before the Hon. L. C. Alexander.

A brief, but very clear and comprehensive, statement of the material facts will be found in the opinion of the court.

*Battle & Maxey*, for the appellant. The court erred in overruling defendant's motion for a new trial. Two grounds of the motion are insisted upon.

1. That the verdict was contrary to the law.

2. That the verdict was against the evidence.

The charge of the court on insanity produced by drunkenness is in these words, to wit:

" If, considering the evidence and the law as charged, you have a reasonable doubt as to the guilt of defendant of murder in the first degree, and believe from the evidence, beyond a reasonable doubt, that defendant, A. J. McCarty, did voluntarily kill Lewis Brinkley, by the means charged in the indictment, at the time and in the county as charged, and that the means used was calculated to cause the death of said Brinkley, you will find him, the said A. J. McCarty,

guilty of murder in the second degree, and so say by your verdict, unless he, the said defendant, was at the time mentally incapable of having a criminal intent, or knowing the wrong of the act charged to have been committed. But if you have a reasonable doubt as to whether defendant, at the time of the killing (if any), had the ability to know right from wrong, so as to entertain a criminal intent, you must acquit."

"If the faculties of the mind necessary to distinguish between right and wrong are destroyed, or do not exist, it is not material from what cause or combination of causes such disability arises, nor whether the same is temporary or permanent; no act of the person while of such mental *status* is deemed a crime."

This we take to be a clear and perspicuous exposition of the law on the subject of insanity produced by the excessive use of intoxicating liquor. We wish to be understood as not appearing before the honorable Court of Appeals, or before any forum, as the apologists of drunkenness. As lawyers, we wish to discuss this subject in a legal and philosophical view.

There is an idea prevalent that insanity produced from sudden drunkenness is no excuse for crime. In one sense this view is correct, but in another it is not true, when we reason upon this subject as we do upon all other phases of the mental and moral *status* of the mind. The former view was at one time the law. It was so in the ancient common law. But from the reflections and investigations of mental philosophers, and the more matured opinion of jurists, a great and salutary modification of the old law has been adopted, and a more reasonable and humane view now obtains. *Terrell* v. *The State*, 43 Texas, 503; *Wenz* v. *The State*, 1 Texas Ct. App. 36; *Johnson* v. *The State*, 1 Texas Ct. App. 146; *Loza* v. *The State*, 1 Texas Ct. App. 488.

Your honors said, in delivering the opinion of the court

in *Wenz* v. *The State*, *supra*, " that no fixed rule could be laid down upon this subject, each case depending upon the particular facts." This is certainly true, for very obvious reasons. The tendency of modern decisions, however, is to approximate, as near as may be, a general rule upon the subject. But little is known, with scientific accuracy, upon the subject of insanity. We can only arrive at our conclusions as to that state or condition of the mind which we call insanity from certain acts or conduct which, we conclude, is inconsistent with the right use of the mental and moral faculties. That state of the mind which we call insanity may be produced from a variety of causes. It may be produced from bodily disease, excessive and sudden grief, from a blow on the head, from epilepsy, from drunkenness, and many other causes.

But, whatever may be the cause, the state of the mind is the same, and it would be difficult to perceive any difference in the characteristics of insanity, whether produced from one cause or another, except as to its degrees. There may be degrees in this mental malady, but the *status* of the mind as to sanity or insanity is the same. If insanity produced from a blow on the head exempts from punishment, as in the case of the unfortunate man who attempted to kill King George of England, and who was so ably defended by the great Erskine, is there any reason why insanity produced from drunkenness should be made an exception to the rule? Can any philosophical reason be assigned why there should be a difference? In any case, insanity is not the normal condition of the mind; and, whatever may be the causes which produced the abnormal condition of the mind which we call insanity, " the condition itself is the same."

It has been announced by high judicial authority that drunkenness, *per se*, does not excuse crime, yet it may be considered by the jury, in order to ascertain whether or not the party is capable of forming a " criminal intent." What

would logically follow from this doctrine? If the party was in a condition which rendered him incapable of forming a "criminal intent;" if he was in a state of mind not to apprehend or comprehend the result of his act, he could not be punished. What is the criterion of legal or moral accountability? It is that state or condition of the mind that enables one to distinguish between right and wrong. Insanity, then, from what cause soever, must be treated by this rule. If the ability to distinguish between right and wrong is the measure of accountability, wherever this state of the mind is found to exist, whether it be produced from one cause or another, it exempts from punishment. Who can draw the line of distinction between them?

It is readily granted in this argument that in cases where the passions have become inflamed by the use of intoxicating liquor, with a previously-formed design to commit a criminal act, it would be no excuse, because the criminal intent was formed while the mind was capable of distinguishing between right and wrong; and what follows is but the result of a preconceived design. Let us take a case to illustrate the argument. Here is a man with no malice towards any one; he becomes suddenly drunk from the use of intoxicating liquor—is, in fact, bereft of reason, acts like a maniac—goes out into the street or highway and kills the first man he meets. Does he know right from wrong? If he does not, you punish him for being found in that condition, under the pretext of punishing him for crime. Take another case: Here is a man who suddenly becomes deranged from any other cause. He is a maniac. He starts out like the other, and slays the first man he meets. Under the law he is exonerated from punishment. Can any reason, legal, logical, or philosophical, be given why one should be punished and the other not? Is not the condition of the mind in both the same, though produced from different causes? From this reason we conclude that the charge of the able

VOL. IV. — 30

judge who presided in the trial of this cause, that "if the faculties of the mind necessary to distinguish between right and wrong are destroyed, or do not exist, it is not material from what cause or combination of causes such disability arises, nor whether the same is temporary or permanent, no act of the person while of such *status* is deemed a crime," was a correct exposition of the law.

Now, let us apply this statement of the law to the facts in proof. The defendant is proven to have been very drunk at the time the homicide was committed. His immediate relations and friends who know him best start with him home, to avoid his getting into trouble in town. When they reach their camp, on the opposite side of the river, he seizes a pair of spurs, puts both on one foot, insisting that he is right, mounts his horse and starts off at a furious pace, takes the wrong road, halts McCrary, the first man he meets, swings his pistol round, and demands his papers twice. He acts like a crazy man. At this instant of time Welsh, who is following to take care of him, tells him that man is all right; he passes on at rapid speed; the next man he meets is Alexander, who is driving a wagon and team; he rushes into the team as if he could ride over a wagon and team; when out of this trouble he passes on at the same rapid rate, rides into Smith's farm, urging his horse to still greater speed, waves his pistol, and cries out to every house he passes, "Get to the woods," as if demons were pursuing him; rides up to the cabin of deceased, jumps off his horse, drinks water at the door, says the Yankees are just behind him, orders the old man to catch the gray mare, as she is the best horse in the lot, or he would shoot him; the old man refuses to do so; does shoot him, mounts his horse and flies as before, as if the pursuing Yankees are in hot pursuit; goes out the road about a mile distant from where the homicide is committed, and retires a short distance from the highway; lies down; is found in a condition

of insensibility when his pursuers come upon him and arrest him; when aroused, cries out, " Hey, here, what does this mean?" Is told that he has killed one of their neighbors; he replies that he was forced to do it by Company G, of Louisiana, or he would himself be killed.

Will any one say, after reading this evidence, that this man was sane? If so, we would like to be informed what insanity is! Will it be said he was under mental hallucination? If that be the solution, we say that it was an hallucination that rendered the man unable to distinguish between right and wrong. Does not the whole evidence show that the man was incapable of forming a " specific and rational intent to take life?" Was he not impelled to it by the insane idea that Company G forced him to do it? Now, if he was incapable of distinguishing between right and wrong under the law, as we understand it to be held by this court, he could not be punished. Suppose defendant had not tasted a drop of whisky that day, or for a year before, and acted thus, would you call him sane? If insanity was the state of the mind in the last case put, would it be any less so in the defendant's case as disclosed by the evidence? If the law excuses in the one case, why not in the other?

We know that there is a sentiment in all our hearts that it would be unsafe to society to turn such a man loose upon the community. It is but a sentiment, however, and is founded upon neither law nor logic. We might say the same thing from insanity produced from any other cause. The law regards very tenderly the life and liberty of the citizen, and will never punish where the objects of punishment would be defeated. Its punishments and penalties are denounced against those only who have the mental condition to know right from wrong.

Your honors are asked to take the facts of this case and apply them to the law as given by the judge who presided upon the trial, and we think that the verdict of the jury

cannot be sustained, because it is against the law.   If the verdict is bottomed upon the facts in proof, and the jury believed that the defendant was in his right mind and could distinguish between right and wrong, then the verdict is against the evidence, and, in either view, the judgment should be reversed and a *venire de novo* awarded

*George McCormick*, Assistant Attorney-General, for the State.

ECTOR, P. J.   The defendant was indicted for the murder of Lewis Brinkley ; he was tried and found guilty of murder in the second degree, and his punishment assessed at twenty-five years' confinement in the penitentiary.   The defense mainly relied on is that defendant was drunk and insane at the time of the homicide, and did not know right from wrong.

The first error assigned is " that the court erred in overruling defendant's motion for a continuance."   This application for a continuance states the facts which the defendant would be able to prove by most of the absent witnesses, their residence, and the diligence used by defendant to procure their attendance at the trial.   They were principally wanted to prove that defendant was drunk and crazed by the use of intoxicating liquor at the time Brinkley was killed, and that he was incapable of committing a crime.

An examination of the statement of facts, and of the bill of exceptions taken by the defendant to the ruling of the court on the application for a continuance, sustains the action of the court.   We do not believe that defendant was prejudiced by overruling his application for continuance. Quite a number of the witnesses, both of the State and the defendant, testified as to the condition and mental *status* of the defendant, and as to the extent of his drunkenness at, before, and after the time he fired the fatal shot.   The ques-

tion as to his mental *status* and condition was submitted to the jury, in a charge by the court more favorable to the defendant (if anything) than he was entitled to under the law.

The statement of facts shows that defendant, on the day of the homicide, had been to the city of Waco, in McLennan County, where some of his family had a case in the County Court. He kept sober and peaceable until the case was disposed of; afterwards he took several drinks of whisky, or some other intoxicating liquor. He is easily excited by stimulating drinks; so much so that some of the witnesses testified they believed him insane when under the influence of such stimulants. The witness Welsh, the father-in-law of the defendant, and the man who left Waco with him on the day of the homicide, gave it as his opinion that defendant was very drunk when he reached Smith's farm; that he was so drunk he did not know the right road home, and did not know the witness.

The facts in immediate connection with the killing are as follows: Lewis Brinkley, the deceased, was quite an old colored man, confined to his house by age and infirmity. His wife and her two children, a son and daughter, were living with him on the Stanley Smith farm, some three or four miles from the city of Waco. He owned a gray mare. On the evening of September 17, 1877, he was killed by the defendant, under the following circumstances: The defendant rode rapidly up to the door of the cabin of the deceased, got off of his horse, went in, and asked for a drink of water. The deceased was sitting down in a low chair by the fire, leaning over, eating out of a skillet. A table was between deceased and defendant. The old man told defendant where the cup and water were. After the defendant had taken a drink of water, he told the old man he wanted his best horse, and asked if the gray mare was not the best; and said that the Yankees were coming, and would kill them all. About

this time defendant pulled out his pistol, and spoke to Mrs. Brinkley's little boy, saying to him, " Go and catch the gray mare for me, G—d d—n you, or I will kill you." The boy commenced crying, and ran under the bed, telling the defendant that he could not catch the mare. Defendant then turned to old man Brinkley and said to him, " You d—d old gray-headed son of a bitch, you go and catch me the gray mare, or I will shoot your d—d old head off." Deceased replied, " Master, I can't go and catch her; she is in the lot, and if you want her, go and get her." The defendant then stepped one step backward, stooped down, put his pistol under the table and fired; the ball struck the old man on the head, just about his right temple, and killed him instantly. The defendant at once mounted his horse and rode rapidly away.

If the defendant was so drunk at the time he shot the deceased that he did not know what he was doing, certainly the killing of the old man, under the facts in this case, would not be less than murder in the second degree. The fact of drunkenness may be proved to show the mental *status* of the slayer at the time of the act, to enable the jury to determine whether the killing is murder in the first or in the second degree. Temporary insanity produced immediately from intoxication does not destroy legal responsibility, or constitute a defense for crime, where the accused, when sane and responsible, makes himself voluntarily intoxicated. The law makes men, drunk or sober, responsible for the immediate consequences of their own acts. If a state of temporary insanity follows as the immediate result of drunkenness, the man is criminally liable for what he does in that condition. The application of this doctrine has been discussed at some length by this court in the case of *Colbath* v. *The State*, decided at the present term, and the true principle laid down, *ante*, p. 76.

The next error assigned is that the court erred in over-

ruling defendant's application for a change of venue. The defendant filed a motion for a change of venue, on the following grounds, to wit:

"1. Because there exists in the county of McLennan, where the prosecution was commenced, so great a prejudice against him that he cannot obtain a fair and impartial trial.

"2. Because there is a dangerous combination against him, instigated by influential persons, by reason of which he cannot expect a fair trial.'

This application was supported by the affidavits of seven other citizens of McLennan County, who also attach to their affidavits an extract from a newspaper, marked "Exhibit A," the same being an editorial from the *Daily Examiner*, published in the city of Waco, giving an account of the killing of Brinkley by the defendant, soon after it occurred, as a reason, in part only, of the grounds of said prejudice.

The court examined the persons whose names were to the affidavit supporting the motion touching the facts stated therein. Other citizens of McLennan County were called and examined in regard to the same matters. This was done over the objections of the defendant. The correctness of this action of the court is no longer of doubtful or questionable propriety in this state. We do not believe that the court abused the discretion conferred upon it by law, after hearing the evidence for both sides, to overrule the application for a change of venue. *Noland* v. *The State*, 3 Texas Ct. App. 598; *Grissom* v. *The State*, decided at the present term of this court, *ante*, p. 374; *Buie* v. *The State*, 1 Texas Ct. App. 452, and cases there cited.

The court did not err in refusing to allow the witness Welsh to answer the following question, to-wit: "Did the defendant, by reason of his drunkenness, know you, or any one else." The question was leading. If the state or

condition of the defendant's mind at the time of the homicide was a proper subject of inquiry, then, certainly, the interrogatory should have been differently framed. The question embodied a material matter, to-wit, the defendant's drunkenness, in grading the degree of his offense, if found guilty. We cannot perceive that any injury or prejudice could possibly have resulted to the defendant by this action of the court, for the record shows that the fact sought to be elicited by the question was assumed by the witness Welsh. The question asked assumed that defendant was drunk, which was clearly improper. 1 Greenl. on Ev., sec. 434.

Counsel for the defendant contend that the verdict of the jury is contrary to the charge of the court, and is not supported by the evidence. We think otherwise. The verdict, in the light of the facts, shows that the jury tempered justice with mercy. The verdict and judgment are well supported by the facts, and are in accordance with the principles of law and justice. At least, we believe that the defendant is the last man who ought to complain of them.

The defendant had a fair trial, has been ably defended, and legally convicted. The judgment of the District Court is affirmed.

*Affirmed.*